The plaintiff is the widow of Benjamin H. Bailey who was killed when he was struck by a truck belonging to the defendant, Emile Reggie, which was insured against public liability by his co-defendant, The Highway Insurance Underwriters. It was being driven by Clarence Doucet, an employee of the owner, Emile Reggie. The accident happened on Sunday afternoon, February 14, 1943, on State highway No. 26 which runs directly north and south between Crowley and Eunice. Her husband was instantly killed in the accident and she has instituted this suit to recover damages for his death against both defendants, in solido, in the sum of $20,240.47, for herself, and in the further sum of $6,500 in her capacity as the natural tutrix of her minor son, Edward Gerald Bailey, issue of her marriage with her said deceased husband.
The deceased was employed as foreman of a crew working for the Department of Highways of the State of Louisiana and on the afternoon of the accident they were actively engaged in working on the highway at the point and in the vicinity where the accident occurred. The United States Fidelity Guaranty Company carried compensation insurance for the Louisiana Department of Highways and it became obligated to and did pay the widow compensation in the sum of $10.50 per week up to the time this suit was filed and acknowledges its obligation to pay an additional period at the same rate up to 300 weeks. It also was obligated to pay the sum of $150 for funeral expenses. It therefore intervened in the suit and asked that it have and recover judgment from the defendants, in solido, for the sum of $3,300 and further that said judgment decree that the said amount be paid out of any award the plaintiff may obtain from the defendants and in preference to any payment made to her to the extent of the full amount of $3,300 with interest. *Page 700 
From the allegations contained in the plaintiff's petition we get a general idea of the situation which existed on the highway just before, and at the moment the accident took place. The equipment on the road consisted of three trucks and a grading machine which was pulled by a caterpillar tractor. About 4:45 o'clock in the afternoon, the three trucks had been parked on the west side of the highway which is a standard eighteen foot hard-surfaced road with shoulders adjoining on each side. This was at a point approximately five and one-half miles north of the City of Crowley, and the three trucks were parked one behind the other, all facing north. According to the allegations as made, there was a distance of about fifteen feet between the first truck, which is referred to as the Bailey Truck, and the second, referred to as the Foreman Truck. Between the second or Foreman truck and the third or last truck the distance was eighteen to twenty feet. The road machine unit was in operation at the time grading, or as it is referred to in the pleadings and in the testimony, "pulling" the dirt from the ditch on the east side of the highway approximately sixty or seventy yards south of where the trucks were parked. The tractor which was pulling the grader was headed and going north.
After stating what the situation was, plaintiff then alleges that at that time her husband was standing on the west side of the highway, between the dividing line and center thereof and the west edge of the paved portion, a distance of four or five feet east, and the same distance north of the front or right front fender of the Bailey truck. That there was no other obstruction whatever to hinder the view of a driver of a vehicle approaching him, but that a truck with trailer attached, being driven north by Clarence Doucet at a speed of twenty-five miles per hour, without giving warning of his approach, struck her husband from the rear and as a direct and proximate result thereof, killed him instantly. She alleges that the driver, Doucet, was acting within the course and scope of his employment, a fact which is admitted by the defendants and which is not at issue in the case.
She alleges that the proximate cause of the death of her husband consisted in the following acts of negligence on the part of Doucet, the driver of the truck: (1) That he did not reduce his speed upon approaching the tractor and grader and the three trucks parked on the west side of the road after seeing the employees on the ground around these vehicles, to a speed where he could stop instantly in the event one of them should step in the front thereof; (2) that he did not blow his horn or give any other warning of his approaching after seeing the deceased standing on the west edge of the pavement; (3) that after seeing the deceased standing there, he turned his truck from the east travel portion, which was his right side to be on, to the west lane of travel on the pavement, which was his left or wrong side; and (4) that he did not stop his truck before striking the deceased, which he had plenty of time to do after seeing him standing on the pavement or after he should have seen him had he been keeping a proper look-out.
The allegations made by the intervenor in its petition of intervention, with regard to the manner in which the accident happened, and the charges of negligence made, are very much the same as those contained in the plaintiff's petition.
There was an exception of vagueness filed to both petitions which was overruled by the trial judge, after which the defendants filed a joint answer in which they admit that the accident happened at the point on the highway indicated in plaintiff's petition, but deny that it took place in the manner therein set out. They deny particularly that the driver of the Reggie truck was guilty of any negligence or carelessness which brought about or contributed to the death of plaintiff's husband and aver that to the contrary, the sole, direct and proximate cause of the accident in which he was killed was his own gross negligence and carelessness in walking across a highly travelled public highway without stopping, looking or listening directly into the path of the on-coming truck which was traveling on its proper side of the road at a speed of about fifteen miles per hour.
Setting out their version of the accident defendants aver that the three trucks of the highway department were parked on the west side of the road but that the second truck which was referred to as the Foreman truck was parked about seven feet south of the first or the Bailey truck, and that all three trucks had their left wheels about one foot west of the west lane of the asphalt pavement on the dirt shoulder and that all extended about six feet on the west lane of the paved portion *Page 701 
of the highway. They aver that the road grader was being operated on the east side of the highway traveling in a northerly direction.
They then aver that Doucet, after checking his truck and trailer, left Crowley about four o'clock that afternoon on his way to Opelousas by way of Eunice. That he was traveling at about twenty miles per hour when he passed the caterpillar tractor and road grader and saw the three trucks parked ahead of him. That as he approached them he reduced his speed to about fifteen miles per hour being at that moment on the east side, which was the proper side of the road for him to be. That as he passed the Bailey truck he, for the first time, saw the decedent walking in an easterly direction across the road, against a high north wind which was blowing at the time, with a bucket in his hand. That up to that time he had been hidden from the truck driver's view by the three trucks. That on seeing him crossing directly in the path of his truck, Doucet realized that he could not stop in so short a distance nor could he hold to his right, on the east, because the decedent was then walking in that direction. He therefore swerved his truck to his left in an attempt to avoid striking him. The decedent made no attempt to avoid the accident which followed immediately as it was impossible for him to pull far enough to his left because of the trucks parked on that side. The deceased was struck by the right front fender of the truck.
In the alternative defendants plead that if it should appear that the driver of the truck was guilty of any negligence, decedent was guilty of negligence himself which caused or contributed to the accident for the reasons which have just been set forth.
The answer to the petition of intervenor follows the same lines as the answer to plaintiff's petition and liability for the compensation insurance which the intervenor has already paid or is obligated to pay is denied.
The case was tried before a jury which rendered a verdict which is worded as follows: "Verdict for the plaintiff in her individual capacity in the sum of Thirty Two Hundred ($3200.00) Dollars, with interest, and in her capacity of natural tutrix in the sum of no Dollars. Verdict for intervenor in the sum of Thirty Three Hundred ($3300.00) Dollars, with interest. Signed E.E. Edmundson, Foreman." The defendant filed a motion for a new trial which was overruled and judgment was then signed in accordance with the verdict of the jury. The defendants have taken and perfected the present appeal and the plaintiff has answered asking that the judgment be amended by increasing the amount of the award to the sums prayed for and that as thus amended it be affirmed.
The facts up to the moment of the accident are not seriously disputed except with regard to the distance which the trucks projected on the paved portion of the highway. That may be important in considering the question as to how far the deceased had stepped from in front of the Bailey truck and what opportunity the driver of the Reggie truck had of seeing him and taking steps to avoid striking him. There is a little discrepancy also as to the distance between the Bailey truck and the truck immediately back of it, but we do not consider that a question of any great importance unless it be to determine exactly the number of feet the driver had ahead of him when he first saw Mr. Bailey crossing the road.
The only witness who actually saw the whole accident was Doucet, the driver of the defendant truck. Two members of the crew working with Mr. Bailey saw him just before the accident but neither of them saw it actually happen. These two witnesses were Aaron Foreman and John B. Bertrand. Foreman says that he saw him about two minutes before he died and at the time he was putting water in the radiator of his truck. He, Bailey and Bertrand were together talking and then he left and walked back to his truck. To get there he walked along the shoulder on the west side of the truck and when he got about even with it he heard brakes squeaking. He then saw Mr. Bailey's hat fly off and saw him go underneath the Reggie truck. When he first saw that truck it was passing by the Bailey truck. The witness Bertrand says that he last saw Mr. Bailey when he was right in front of his truck on the side of the road. He does not recall whether Aaron was with them or not. After he had talked to Bailey he left and walked back to the side of the second truck which was the Foreman truck. He was on the paved portion of the highway and saw the Reggie truck coming down the road at a speed which he estimates to be from 20 to 25 miles. He says the second truck was about 6 or 7 feet back of the Bailey truck *Page 702 
and he was standing on the side of it. When he first saw the Reggie truck it was on its right hand side of the road and after it passed him it swerved to the left and then started back again towards the right. He did not see the actual impact of the truck with Mr. Bailey's body but did see the body being dragged some 10 or 12 feet under the truck in a northwesterly direction. When the truck came to a stop some 20 to 22 feet after striking him, the body rested in front of the back wheel on the left hand side. On cross-examination this witness says that after leaving Mr. Bailey standing in front of his truck he walked to the back end of the Aaron truck where he was standing when the Reggie truck passed him and then in answer to a further question says that the last time he saw Mr. Bailey was when he was crossing the road going for a bucket of water. He was then about 2 or 3 feet on the west side of the black top. In the position he was he could not see the actual impact and this, evidently, because after the Reggie truck passed him it hid his view of Mr. Bailey.
The testimony of the driver of the truck does not differ from that of these two witnesses save in a few minor respects. He says that he was driving about 25 miles an hour as he reached the scene of the accident and that when he saw the situation on the road ahead of him, he slowed down to about 20 miles an hour. He says that the tractor pulling the road-grader occupied a portion of the hard surface on the east, or his side of the road, and that he had to pull over a little to the left in order to pass it. He then pulled back to his right in order to pass the three parked trucks and had to do so because, as he contends, the bodies of these trucks extended from 4 1/2 to 5 feet on the hard surface part of the road. As he passed the truck parked back of the Bailey truck he then for the first time saw Mr. Bailey on the road ahead of him, at which moment he says he was stepping over the black line, meaning the center of the asphalt part of the road. He slowed down his truck to about 15 miles an hour, immediately put on his brakes and pulled to his left as Mr. Bailey was then more to the right of him. To continue straight ahead as it was, he says, would have meant that he would have run head-on into him. His turning to the left at that moment was an effort to avoid striking him but on account of the situation existing on the highway he could not pull over far enough and the right front fender of his truck, or the head light on that fender, struck Mr. Bailey and knocked him down. According to his testimony when Mr. Bailey first stepped out on the road and was first seen by him he was no more than 18 or 20 feet ahead of him. After striking him his truck ran about 55 or 60 feet before he came to a stop.
We believe that under the facts, as we find them, the driver of the Reggie truck had no opportunity of avoiding this accident. The difference in the number of feet which the parked trucks occupied on the hard surface portion of the highway makes no material difference in our opinion. Some of the plaintiff's witnesses admit that they extended over as much as 18 inches or 2 feet, which would be a difference of 2 to 3 feet between their estimate and that of the defendants' witnesses. The difference that would make would be in the distance Mr. Bailey had walked on the highway in front of the Reggie truck and was in a position to be observed by the driver Doucet. Assuming that he had the step of the average individual which is 3 feet, that would mean that he would have taken less than one step more than he would have had to take had the truck extended 4 or 5 feet on the highway, after emerging from the front of his truck, and one step more we do not believe would have made very much difference in an emergency such as confronted the driver of the truck which struck him.
[1-3] In cases of this kind it is impossible to relieve a person of normal intelligence and possessing the normal senses of sight and hearing of any negligence when he suddenly steps from in front of a parked vehicle on the highway without taking the usual and simple precaution of looking to see if there is any traffic coming from the direction in which his vision is obstructed. The law is well settled that in such cases, unless the driver of the offending vehicle sees such a person in time, or can be held to have seen him, or has reason to anticipate his presence in some way, and therefore had the last clear chance to avoid running into him, he is not to be held guilty of negligence. A rule on the subject is stated in American Jurisprudence Vol. 5, p. 612, Sec. 196, as follows: "A driver of an automobile is not bound to anticipate that a pedestrian may suddenly run from behind a parked automobile into his car, or into the path of it, or do the same *Page 703 
in alighting from a car, in the absence of anything to put him on notice that such an event is likely to occur. If he is driving at a reasonable rate of speed, so that he is able to stop immediately or within a reasonable distance, no liability exists. He must however, observe whether any person is about a car, standing by the road side, and he must have his car under control. A driver may be put on notice, so that ordinary care requires him to operate his car more slowly and having it under better control, by the fact that he is passing through a busy thoroughfare on which machines are parked and on which people are crossing at any point."
Analyzing that rule and applying its different provisions to the case at bar, the first question which comes to mind is whether there was anything with regard to the situation existing on the highway at the time to put the driver, Doucet, on notice that the decedent would suddenly step from in front of the parked truck onto the road in front of him. The situation was not ordinary, in as much as this road grader was working on the road several hundred feet south of the three parked trucks on the highway, but it does seem that the driver Doucet took notice of all of that by slowing down his speed first to pass by the road grader and then pulling his truck over to his right again in order to safely pass the trucks. Nothing that existed in the situation, was of such nature as to give him any idea that Mr. Bailey might be standing in front of the first of these parked trucks. On the contrary, Mr. Bertrand, the only one of the crew he saw before, was standing on the side of the second truck and if he had to assume anything about any other members of the crew being around, it would have been proper for him to assume that the others would also have placed themselves where they could see traffic coming on the highway.
We think that the driver also complied with the second provision of the rule as his rate of speed certainly was not unreasonable. He himself says that he was never going more than 25 miles per hour before he reached the site of the accident and slowed down to 20 miles in order to pass the road grader. The witness Bertrand who saw him coming estimated his speed from 20 to 25 miles per hour. He was driving a truck loaded with 18,900 lbs. of freight and considering the distance in which he stopped it after striking Mr. Bailey it looks to us as though he was driving at a prudent and reasonable speed. Further, we believe that he did observe the situation as he actually saw Mr. Bertrand standing on the side of the road. The latter was not in any danger and Doucet had no reason to have his truck under any greater control than he did at the moment he passed the truck near which Bertrand was standing.
The last provision of the rule may not be applicable to this case as it seems to contemplate a place where traffic is more congested than on the highway involved here. But even so there was no particular reason for the driver, Doucet, to anticipate that a man would leave a position from in front of a parked truck and proceed straight onto the highway without taking the precaution to see if it was safe for him to do so.
[4] The preponderance of the testimony is to the effect that Mr. Bailey had not taken more than one or two steps from his position in front of his parked truck at which time the driver of the defendant truck was at the most 20 to 22 feet away from him. When he says that Mr. Bailey was stepping over the black line at the moment, which we think is about correct, that would mean that he was taking his first step or his first step and a half in the clearance ahead of the Reggie truck, and in our opinion it would be asking the impossible of a driver of a loaded truck such as this one was to have come to a stop within that distance.
It is strongly contended that Doucet did not blow the horn of his truck or give Mr. Bailey any other warning. There was no other warning he could have given him. The noise of the truck should have been audible to Mr. Bailey before that time and if he heard it, he did not seem to heed its approach. As for blowing the horn we cannot see what purpose that would have served had it been sounded when Doucet first saw Bailey on the highway. If anything it might have led to the latter's confusion.
Much is said also in argument about the skid marks which appeared on the highway but it is not disputed to any great extent that the driver Doucet applied his brakes at the time he said he did when he first saw Mr. Bailey and that his truck carried *Page 704 
forward 55 to 65 feet. Considering the load he had, we would say that that was about as good a stop as he could have made under the circumstances.
[5] In applying the rule of last clear chance the way it has been interpreted, it must appear that the party operating the vehicle or other instrumentality which causes the accident must or should have seen or sensed the perilous position in which the victim of the accident was at a time when he could have taken some step in order to avoid running into him. As we know it has been applied in cases where a motorist or a locomotive engineer saw the victim a safe distance ahead of him and in spite of the latter's apparent obliviousness to danger, took no steps, until too late, to bring his car or the train under control and thus avoid running into him. But such was not the situation in this case as the victim never gave the driver of the offending truck a chance to see him before it was too late for him to do anything more than what he did in order to try to avert the accident. In several decisions of our courts, under a state of facts of a similar nature, the rule was held not to apply.
[6-8] One of the cases cited in brief of counsel for the defendant is Shelley v. Waguespack, 156 La. 256, 100 So. 417, 419. The facts are a bit different but the principle of law may be said to be pertinent. After stating that there was no reason for the application of the doctrine, the court added: "We have seen that the defendant, after being suddenly confronted with the danger of running into the plaintiff, a danger which he did not and could not foresee, did all that was in his power to avert the collision, and all but succeeded." In commenting on the law, it stated that "Where, in a case like the present one, the pedestrian attempts to effect a crossing without exercising his senses of sight and hearing, and is run into by an automobile, whose driver is without fault, and who had no reason to anticipate the presence of the pedestrian in the street, no liability can possibly attach to the driver of the automobile."
Another case cited is that of Thompson v. Dyer, La. App.,1 So.2d 433. Whilst again the facts in that case are different from those in the present in that the pedestrian did not emerge from behind, between or in front of a parked vehicle, the doctrine of last clear chance was invoked on his behalf and the driver of the offending car was held free from the effects of the rule in view of the fact that he was crossing a street in the middle of a block when struck.
We believe that the case of Williams v. Lykes Bros. S. S. Co., 12 La. App. 127, 125 So. 153, decided by the Orleans Court of Appeal, is more in point as there the pedestrian emerged from between two automobile trucks when the defendant truck was immediately upon him, and as it was shown that there was no time for the driver to stop, the doctrine of the last clear chance was held inapplicable.
The case of Perret v. Geraci, 15 La. App. 329, 131 So. 72, decided by the same Court, is also in point as there also the doctrine of last clear chance, under facts somewhat similar, the only difference being that the pedestrian suddenly appeared on the roadway from an opening to a shed which hid him from the view of the motorist was again rejected.
Plaintiff and intervenor rely almost exclusively on the cases of Rottman v. Beverly, 183 La. 947, 165 So. 153, and Jackson v. Cook, 189 La. 860, 181 So. 195. These two cases however are distinguishable from the present as in both the position of the victim of the accident on the highway was either readily apparent to the driver of the offending car or, as it was held, he should have seen them and realized their perils in time to stop or avoid striking them.
The verdict of the jury in this case impresses us as being one based on sympathetic considerations rather than on what the facts as disclosed and on what the law, in which they were no doubt instructed by the court, is under such facts. The amount of the award to the widow indicates as much, and especially is it hard for us to reconcile the jury's action in rejecting an award to the minor after giving a judgment in favor of the widow. True it is that the verdict was approved by the judge of the trial court who refused a new trial, but we doubt seriously that he thought it necessary to re-try the case after the voluminous record which we have before us had been made up. We look upon his signing of the judgment more or less as a formality as surely if he thought plaintiff should have judgment he must have realized that she was entitled to a larger award and certainly *Page 705 
the minor also should have recovered judgment in some amount.
We conclude therefore that the judgment appealed from should be reversed and, for the reasons stated,
It is now ordered, adjudged and decreed that the verdict of the jury and the judgment of the district court approving same be, and they are hereby, reversed, set aside and annulled, and it is further ordered that there be judgment in favor of the defendants and against both the plaintiff and the intervenor, rejecting their demands at their costs.